Teva Pharmaceuticals USA, Inc. Teva Pharmaceuticals, Inc. Next case is Warner Chilcott v. Teva Pharmaceuticals, 2015-15-88. May it please the Court, very rarely do you come across a case where the defendant itself says it is hard to believe, hard to believe the patentee was able to achieve the claimed invention. But that's what we have here. Teva tried and failed to create a bisphosphonate formulation that could be taken either with or without food. Teva said it could not ethically proceed with the formulation containing more than 5 mg EDTA, even after it had the Atelvia Wasn't it conceded that the Brazilian patent disclosed this invention, except possibly for the addition of the language pharmaceutically effective absorption? No, Your Honor. All that was conceded is that one could hunt there and find the coding agent, the chelating agent, and the bisphosphonate listed somewhere in a laundry list of ingredients. And this is clear at A1109, and then in the 717AM transcript, 64, line 19 through 65, line 7. Was the bisphosphonate disclosed with EDTA, 100 mg dosage? No, Your Honor. What we have in BR 601 is a long laundry list. It gives a list of... it says you can use any bisphosphonate and provides examples. One of those many... The bisphosphonate that's being used here was a common one that was used, right? It was a common one that was used. And 35 mg dose was a common dose, right? 35 mg was in the Actinel dose, and BR 601 said, lower the dose. It's absolutely crystal clear when you look at both the... Certainly, and if one follows BR 601, you have to lower that dose. As far as EDTA goes, what it says is in a particular embodiment, a preferred but not exclusively preferred embodiment, EDTA should not exceed 175 mg. Right above that, it gives a formula for a proportion, a ratio. And putting those two together, if 35 mg against the teachings of BR 601 to lower dose is nevertheless chosen, you end up with 20 to 175 mg. Which BR 601 promises will increase intestinal permeability, which everyone concedes was undesirable. BR 601 teaches against the claimed invention, and I think the evidence that the district court disregarded or dismissed the objective considerations of non-obviousness have much to say here. The TEVA scientists expressed skepticism about the invention over and over again. How did the Brazilian application teach away to them? The BR 601 teaches away from the invention in two distinct ways. First, it tells you to pick a dose and then lower it. It talks on page 1623 about the aim being to enhance absorption so that you don't have to give so much bisphosphonate. 1625 in the reference, and I'm referring to the appendix site, it speaks of accomplishing that invention. Enhancing absorption and thereby allowing the dose to be diminished, to be dropped. So if you started with 35 mg, you're going to go down. BR 601 also teaches- So you're arguing that it teaches away from using 35 mg? Yes. Clearly, and the district court erred in saying it did not suggest that. It doesn't only suggest that. It instructs that. And this is at page A16 of the opinion. The district court said that BR 601 did not suggest using less than the known effective quantity of the bisphosphonate. BR 601 states that the problem is having to give too much bisphosphonate. That's on A1623. And then says that with its compositions, and I'm quoting from A1625, we obtain an effective treatment with a small quantity of bisphosphonate compared to the current treatment by its association with the chelating agent. And then BR 601 speaks in both places about one of the ways that it accomplishes that is by increasing intestinal permeability. That means opening up those tight junctions that the rest of the prior art said oughtn't to be opened. And the rest of the prior art is universal in saying that those tight junctions should not be altered. BR 601 says you're going to get that if you use 20 to 175 mg of EDTA. It's crystal clear on A1623 through A1625 of the appendix. I think they go hand in hand because BR 601 is providing, is describing a formulation containing both. And it says if you use a chelating agent and in smaller quantities than was used in a prior art reference, deliver it to the small intestine, chelate and alter intestinal permeability, then you will be able to enhance absorption and reduce the bisphosphonate dose. So those passages speak to both of these issues. The district court said the parties agree that, quote, somewhere in the Brazilian application are all the elements of the assertive claim, except for the clinically effective absorption. And your argument is that there are a number of bisphosphonates, but that's really an anticipation argument. In terms of obviousness, bisphosphonate is there, EDTA within the range is there, and the only addition is pharmaceutically effective absorption, and that's a functional, that's a result, that's result language. There's nothing in the claim to necessarily bring about that result compared with what's in the Brazilian application. We're dealing with obviousness here, not anticipation. Correct, Your Honor, and in obviousness as well. If all that you have in the principal prior art is a laundry list of ingredients, there still has to be a reason why the person of ordinary skill in the art would have selected those ingredients at those doses. We're dealing with claims that are very particular. Well, the claims here recite quite a large range of EDTA dosages. They're not particular at all. Not in the assertive claims, Your Honor. The assertive claims are very specific. They name the EDTA. Is claim eight an assertive claim? Your Honor, the assertive claims in the 459 patent is claim 16, and by that point the dosages for both the chelating agent and the bisphosphonate have been narrowed. Down to 100 milligrams. Of the EDTA down to 35 milligrams of risedronate, and there's a particular coding agent. 35 milligrams is the common dosage, and the 100 milligrams you can compute using a well-known formula, right? The 100 milligrams certainly could not be computed using a well-known formula. Well, didn't the district court find that that was the case? What the district court found— No, no, no, isn't that the case, that that's something the district court found? The district court—I'm trying to answer your question as best I can. This is on A59 through 60 of the appendix. She cites to Dr. Yates, saying that you can apply two other references, Mitchell and Mahe, combine them, do a calculation, and according to Dr. Yates, you would end up at slightly above 100 milligrams EDTA. On cross-examination, it was 75 to 150. And the prior art, the prior art that— What's wrong with her background? Well, first of all, she disregarded the fact that Dr. Yates said that 75 to 150 would be the range. It's also the case that the district court did not rely on that combination to support its obviousness decision in its entirety. That's in a special section about reasonable expectation of success. Her obviousness opinion is founded and rests on BR 601, which is the reference talking about the chelating agent and the bisphosphonate. Mahe is simply about measuring calcium in the small intestine at different places. Mahe specifically says different results were reached in a different study. There was no attempt on the district court's case. That's the Fairweather-Tate reference that's mentioned. There was no attempt by the district court to reconcile the different teachings in these art. All of this smacks of hindsight. And this court said, time and again, what guards against hindsight? It's the objective considerations of non-obviousness. Skepticism. Those statements by the Teva scientists warning against using EDTA at the doses. This is after they have the Atelvia patents in hand. Example one is Atelvia. And they say it would not be ethical to proceed. They said, as well, that they couldn't find support for the 100 milligrams in the literature. They believed, at the time, that it was not safe. Only in litigation. But, John, I understand that. And I understand you're only asserting the narrowness of Claim 16 here. But your claim does the same thing. It starts with Claim 8, which has these huge, broad ranges of both things, are ones that you now say the prior art taught away from. I mean, it kind of baffles me that you're saying that the earlier stuff didn't teach this. And your patent claims the same thing. I think, Your Honor, that's the essence of hindsight. It's looking at our patents, using them as a blueprint. The specification of our patents also talks about the dependence of the chelator dose and the bisphosphonate dose. It then goes on and provides examples. And I think that it's, in the pharmaceutical arts, having prophetic examples, having broad claims, and then choosing to assert the narrow ones. That's a sensible strategy that's time-honored. But it's the essence of hindsight to look at the patents and use them as a blueprint going backwards. And one of the things— So what was the invention here, figuring out that 100 milligrams was the right amount of EPA? The invention here is the combination of using— The 35-milligram dose of bisphosphate was well-known. And it was well-known that if you used something like EDTA, you would solve the calcium problem. Right? No. EDTA was thought to be unsafe. In BR-601— No, no, I understand. Yes. What you're basically saying is the invention here was figuring out that 100 milligrams was safe. Much more than that, Your Honor, because the other thing is pharmaceutically effective absorption. BR-601 and some of the other references that the court relied on are about boosting, enhancing absorption both in fasted and fed states. Remember, this is an ingredient, the bisphosphonate, that has a very low bioavailability. By some counts, less than 1%. With food, it approaches zero. So most of the references in the prior art were seeking to boost absorption across the board. The inventors here wanted to achieve pharmaceutically effective absorption, similar absorption in fasted and fed states. And that's not what BR-601 was addressing. That's not what W-0111 was addressing, which the district court clearly misread. They actually relied on the earlier tetracycline experiments for that. So if one looks at—boy, Your Honor, we pointed this out in the brief. That's the reference. This is from 1978. There is no comparison there of—and I see that I'm in my rebuttal time. There is no comparison there of the same EDTA and food dose, fasted and fed. Our EDTA and bisphosphonate dose, both fasted and fed. And Dr. Yates admitted in his testimony that there may well have been pre-chelation of the food and the EDTA. And I think that explains also why a 1978 reference of record in the prosecution, like every other bit of prior art, why there was such a gap between that and the time of the invention here. At the end of the day, the objective evidence of non-obviousness was systematically disregarded or ignored. It answers these questions. Why did it—why did the—why did Teva choose? The district court found that those comments were not shown to have been made by someone skilled in the art, right? Yes, Your Honor. That's clearly erroneous. The district court elsewhere relied on those same scientists. Dr. Shake. I believe it's A60, the last line in that footnote that we were discussing. If you look up that transcript site, that's Dr. Shake. Dilberger, who the court relied on, also a toxicologist. One of these Teva scientists is a toxicologist. It's not like these people were working in the mail room. It's simply incredible that this highly probative evidence of non-obviousness was systematically disregarded. And I've got only a few seconds left. I'm going to reserve whatever time I have there. Well, there isn't much, but we'll give you two minutes of rebuttal time. Thank you, Your Honor. Ms. Holland. Thank you, Your Honor. May it please the court, Elizabeth Holland of Goodwin Proctor for Teva. Every single issue that Mr. Ellican raised this morning in his argument was factual in nature and was addressed in a specific finding made by the district court in this case. The district court heard five days of testimony from expert formulators, toxicologists, physicians, and from fact witnesses, was able to assess their credibility, and at the end of the day issued a 68-page careful, extensive opinion that addressed all of the evidence at trial. Was there something unexpected compared with the broader prior art disclosure in the 100 milligram EDTA composition? No, Your Honor. There was nothing unexpected. As the district court found, BR-601 taught a range that went from 20 to 175 milligrams. The district court found that BR-601 in particular addressed the issue head on that had been raised in the prior art that Mr. Ellican alluded to. Mr. Ellican said there was a safety issue with high amounts of EDTA. BR-601, as the district court found, said, Look, I'm acknowledging that issue in the prior art, and I'm teaching you how to solve it. Use a lower amount of EDTA, and you can do that by administering to the small intestine instead of the stomach. It takes care of any safety concerns. Poiger, also pointed to by the district court, said, I used 250 milligrams of EDTA on an empty stomach in the fasted state. No harm, no excess absorption. So there was nothing unexpected about the 100 milligrams here. And it was Warner-Chilcott's burden in this case. Once it was shown that the 100 milligrams of EDTA was encompassed within the range of BR-601, Warner-Chilcott had to rebut the presumption that that range was obvious, either by showing a teach-away or by showing criticality. And as the district court found, it was able to establish neither one of those. The references, as I mentioned earlier, that Mr. Ellikin points to, and as Warner-Chilcott pointed to in its briefs, all used very high doses of EDTA on the order of 7,000 milligrams or so. None of them that allegedly teach this safety issue had anything near 100 milligrams of EDTA. The Poiger reference addressed 250 milligrams. Importantly here, there was no expert testimony at trial rebutting Dr. Yates' testimony on Poiger. The district court properly found, based on unrebutted testimony, that Poiger taught that 100 milligrams would be safe. Also importantly, the district court found that the experts had agreed that even in the fasted state, there's always a calcium buffer in the intestines. So you can give EDTA on a completely fasted state, and there would be no harm at all to the tight junctions unless all the calcium reserve in the intestines had been depleted. And that simply wouldn't happen with 100 milligrams of EDTA, as the district court found and as the experts testified. And this was not the first time that Warner-Chilcott had characterized those references, the Lynn, Jenner, Zekalch references that it now claims teach safety concerns and teach away from the 100 milligrams. In fact, Warner-Chilcott had used those very same references to convince the FDA that 100 milligrams was safe and could be used in its product. Using the opposite arguments at a data trial to show that the district court, to try to convince the district court there was a teach away. Same thing at the patent office. Warner-Chilcott has repeatedly said in its briefing that all these references were before the examiner. What the examiner didn't know is about the Warner-Chilcott statements to the FDA characterizing those references as teaching no problem with 100 milligrams. I'll address briefly the secondary considerations points. It's hard to understand Mr. Ellicott's argument that the district court overlooked something. If you look at the court's opinion, there's a careful analysis of every single one of the secondary considerations that Warner-Chilcott had tried to convince the court existed in this case. Warner-Chilcott doesn't like the result of that analysis, but there's no way to look at the opinion and say the district court didn't consider all the evidence. Are only claims 16 and 20 of the two patents at issue? Yes, those were the only two claims at issue in this case. But what's important, and as I think all of the court noted earlier, Warner-Chilcott says in its claims that 10 to 500 milligrams of EDTA will give you pharmaceutically effective absorption. Those claims had to have been enabled, or Warner-Chilcott could not have gotten them out of the patent office. So there's no way now for Warner-Chilcott to come back and say any amount of EDTA in that range would not work. They simply could not have patented it if it wouldn't work. So it's kind of beside the point that the particular claims at issue here only have the 100 milligrams of EDTA. So did the court only decide that claims 16 and 20 are invalid? Not the rest of the claims? Correct. I think I'll sit down unless there are other questions from the bench. Thank you. I didn't think so, Your Honor. Mr. Allerton, we'll give you two minutes. Thank you, Your Honor. The 20 to 175 milligram range, there was a failure in there, 40 milligrams. The court disregarded that. That was PEVA's own failure with its own attempt to make a bisphosphonate formulation to anticipate atelvia. It fits within the range. It shows that it matters what dosage is picked. The district court said that there was no evidence as to why it failed. A3785, which is the document the district court cited to, says there were no measurable resedrinate concentrations in the fed state. Clear error. Copying. There is no contention here that the district court, as I understand it, the district court simply disregarded the issue of copying. There's a section in the memorandum of opinion titled Failure of Others in Copying. It doesn't address copying. If it didn't matter what dose was chosen, why was PEVA picking the same chelator at the exact same dosage? It didn't need to do so to comply with FDA requirements. There was simply no explanation. That the experts agreed to the safety of these low doses? Not true. I'd like to point to the undisputed evidence that the prior art said that segments Why do they have to agree? I believe that was the statement I heard, Your Honor. But in any event, Dr. Dillberger, and this was in their briefs, said the intestines are often empty based on his experiments with animals. The prior art said that in humans, he said, I'm sorry, I'm not sure if I said that correctly, that they're never empty in animals. The prior art, and this is Dr. Yates, PEVA's other expert, admitting that the prior art taught that segments are often empty. That's A577-79, DTX-264 at 1458. Backup argument. According to Dr. Dillberger, the digested food flies through the intestines so quickly that there can be no concern. But the prior art again, of record, DTX-234, penultimate page in that reference, 615, paragraph 10 said, the transport through the intestines is slow and allows absorption. So Dr. Dillberger is alone and unsupported. That's who the district court relied on in each and every instance. What he said was at odds with the prior art. Thank you, Your Honor. Thank you for your time. Good morning.